**United States District Court**
For the Northern District of California

1

2

3

4

5

6              IN THE UNITED STATES DISTRICT COURT

7

8              FOR THE NORTHERN DISTRICT OF CALIFORNIA

9   TERRELL LOVE,                                No. C 05-3995 JSW

10              Petitioner,

11      v.                              **ORDER GRANTING PETITION**
                                        **FOR WRIT OF HABEAS CORPUS**
12   JAMES A. YATES, Warden,

13              Respondent.

14   _____/

15

16                            **INTRODUCTION**

17          Terrell Love ("Petitioner"), a prisoner of the State of California, has filed a petition for

18   writ of habeas corpus pursuant to 28 U.S.C. § 2254.  After consideration of Petitioner's claims

19   on the merits, the petition for writ of habeas corpus is GRANTED.

20                       **PROCEDURAL BACKGROUND**

21          Petitioner was tried before a jury in Alameda County for two counts of murder, one

22   count of attempted murder, and of being an ex-felon in possession of a firearm.  The prosecutor

23   alleged a special circumstance for multiple murder under California Penal Code § 190.2,

24   enhancements for use of a firearm and for great bodily injury, and two prior prison terms under

25   California Penal Code § 667.5(b).

26          On December 6, 1999, the jury found Petitioner not guilty of the first count of murder,

27   but guilty of the other count of first degree murder, attempted murder, and being an ex-felon in

28   possession of a weapon. The jury also found that Petitioner personally used a firearm in

1  violation of California Penal Code § 12021(a) and inflicted great bodily injury.  (Cal. Penal

2  Code § 12022.7.)  Petitioner admitted the first charged prior conviction pursuant to Penal Code

3  §§ 667.5(b) and 667(e)(1).  On February 23, 2000, the trial court sentenced Petitioner to a

4  state prison term of 66 years to life.

5          Petitioner appealed his convictions, arguing that he was denied due process and a fair

6  trial by improper exclusion of African Americans from his jury and that a pattern of

7  prosecutorial misconduct deprived him of due process and a fair trial.  On September 25, 2002,

8  the Court of Appeal found one sentencing error which required striking five years of the

9  sentence imposed under the § 667.5(b) enhancement, but affirmed the judgment of the trial

10  court in all other respects.

11          On November 6, 2002, Petitioner submitted a petition for review in the California

12  Supreme Court.  The Supreme Court denied the petition for review on December 11, 2002.

13  On March 9, 2004, Petitioner filed a petition for writ of habeas corpus in the Supreme Court of

14  California.  He raised claims that his right to due process and a fair trial were violated when

15  jurors committed misconduct and directed racial animus toward the sole deliberating black

16  juror, when the trial court dismissed that black juror from the panel, and when jurors saw

17  bailiffs use excessive force against petitioner when he objected to removal of the black juror

18  from the panel.  The Supreme Court summarily denied the petition on September 7, 2005.

19          Petitioner filed his petition for writ of habeas corpus in this Court on October 8, 2005.

20  On June 15, 2006, the Court denied Respondent's motion to dismiss on the ground that the

21  petition was untimely.[1]  Respondent filed his Answer on September 14, 2006.  On January 12,

22  2007, Petitioner filed his Traverse.

23  //

24  //

25  //

26  //

27

28  [1]    The Court found that Petitioner was entitled to equitable tolling because he pursued his rights
diligently, and his petition was filed 24 days late because of circumstances beyond his control.  (*See*
Docket No. 18.)

2

**United States District Court**
For the Northern District of California

# FACTUAL BACKGROUND

The facts underlying the charged offenses as found by the Court of Appeal are set forth as follows:

The victims in the two separate shootings involved in this case were Michael Johnson, Sean Johnson (not related), and Collette McDaniels. We abbreviate the review of the facts surrounding the Michael Johnson shooting because appellant was acquitted of that charge.

Count 1-Homicide of Michael Johnson

Cynthia S., the key eyewitness to the shooting of Michael Johnson, was involved in an intimate relationship with Johnson and with Doral Green, another prosecution witness. She met appellant when inquiring about a car he was selling and made plans to date appellant on New Year's Eve of 1994. Cynthia S. told appellant that she was ending her relationship with Johnson because he lied to her and hit her. Appellant told Cynthia S. to contact him every night by paging him and entering a code, and that he would call her back.

On New Year's Eve Cynthia S. was at her apartment with Green, who had taken her shopping. Johnson knocked on the door. When Cynthia S. opened the door, Johnson began yelling and hitting her. He forced her to have sex with him. Green engaged in a verbal altercation with Johnson. Eventually, Johnson left the apartment. Shortly afterwards, Cynthia S. heard shots.

When she and Green went outside, Cynthia S. saw Johnson lying on the ground and appellant running from the area. Cynthia S. went to another apartment and paged appellant. Eventually, Cynthia S. talked to the police and identified appellant as the man she saw running away from Johnson's body.

Green testified that when he looked outside after he heard the shots, he did not see who did the shooting, but only saw Johnson on the ground. He testified that Cynthia S. was not a truthful person. Another witness who lived across the street from the shooting could not identify the shooter.

Counts 2 and 3-Homicide of Sean Johnson; Attempted Murder of Collette McDaniels

Sean Johnson was shot and killed on March 3, 1995. At the time of his death, he lived with his girlfriend, Collette McDaniels, a prostitute and drug user. Johnson was a drug dealer who supplied McDaniels with crack cocaine. On the evening that Johnson was killed, he, McDaniels and some other people were at the corner store. McDaniels and another woman began walking back to the apartment when McDaniels saw appellant pull up in a small blue car, grab Johnson and push him down onto the back of a car. Appellant put a gun to Johnson's head and told him he was going to die. There were five or six men across the street encouraging appellant, saying: "Yeah, do it, man, do it. That's what you get."

Johnson told McDaniels and the other woman to go inside and they went into Lisa Travillian's apartment. Soon after McDaniels entered Travillian's apartment, Johnson arrived and got his sawed-off shotgun. She testified that he started calling his friends, or "comrades." Everyone on the street referred to their friends as "comrades." McDaniels knew that members of the Black Guerrilla Family gang also refer to each other as "comrades."

3

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**United States District Court**
For the Northern District of California

Johnson said something about drug traffic next to appellant's grandmother's house. McDaniels thought that might be why appellant was angry with Johnson. Also, Johnson had insulted appellant in front of appellant's girlfriend.

Eventually several of Johnson's friends arrived, including Mario and someone she referred to as an "old gangster," or "OG" whose name she did not know. The four of them drove around looking for another OG. She believed they had guns in the car, but didn't see any guns.

As the group drove up to Seminary Avenue and Foothill Boulevard, Johnson's friends jumped out of the car and Johnson drove around the block once. Johnson saw his friend "Shaka" and got out of the car to talk to him. Johnson told McDaniels to drive around the block and park. McDaniels parked on a cross street, facing Seminary. McDaniels heard another car pull up and saw that it looked like the small blue car she saw earlier.

Appellant jumped out of the blue car and started walking up the street. McDaniels then saw Johnson walking towards appellant with his hands up, saying: "I ain't got no gat. Can we talk?" Appellant, who had a gun in his hand, said: "Too bad, you should have thought about that before you came up here." Appellant then shot Johnson twice at close range, then walked up to Johnson as he lay on the ground and shot him in the head.

McDaniels started screaming and honking the horn of the car to try to alert Johnson's friends. Suddenly, she saw appellant at her car window, pointing a gun at her. As she turned and threw herself face down on the car seat, appellant shot her. She felt her legs go numb and lost consciousness. An ambulance arrived and took her to the hospital.

By the time McDaniels arrived at the hospital, she was experiencing severe pain in her legs, back and buttocks. She underwent surgery that night. After the surgery, she was unable to walk for a while, and had no control over her bowels. At the time of the trial, she still had a bullet in her spine. Both feet were still partially numb. While she was still in the hospital, she picked appellant's picture out of a photo lineup. She had never seen appellant before the evening of the shooting. She later picked appellant out of a live lineup as the shooter and identified him at the preliminary hearing.

Lydia Gomez, who witnessed the first altercation between appellant and Johnson, testified that they were arguing, but she did not see any kind of physical altercation. Lisa Travillian saw Johnson and another man pushing, shoving and fighting, but did not see a weapon. [FN: At the preliminary hearing, Travillian testified that she saw a gun in the other man's hand.] Travillian could not identify the man she saw fighting with Johnson, although she had identified appellant as the other man at the preliminary hearing.

Appellant was arrested and interviewed by Oakland Police Lieutenant David Kozicki. On the tape recorded portion of the interview, appellant denied that he argued with Sean and that he shot him. After being told that witnesses had identified him, appellant admitted that he argued with Sean because his brother had paged him and told him that Sean was "hanging" in front of appellant's grandmother's house. He denied having a gun."

Petition Exh. A at 1-4.

United States District Court
For the Northern District of California

**STANDARD OF REVIEW**

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a district court may not grant a petition challenging a state conviction or sentence on the basis of a claim that was reviewed on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). The first prong applies both to questions of law and to mixed questions of law and fact, *Williams (Terry) v. Taylor*, 529 U.S. 362, 407-09 (2000), while the second prong applies to decisions based on factual determinations, *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

A state court decision is "contrary to" Supreme Court authority, that is, falls under the first clause of § 2254(d)(1), only if "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams (Terry)*, 529 U.S. at 412-13. A state court decision is an "unreasonable application of" Supreme Court authority, falling under the second clause of § 2254(d)(1), if it correctly identifies the governing legal principle from the Supreme Court's decisions but "unreasonably applies that principle to the facts of the prisoner's case." *Id*. at 413. The federal court on habeas review may not issue the writ "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id*. at 411. Rather, the application must be "objectively unreasonable" to support granting the writ. *Id*. at 409.

Under 28 U.S.C. § 2254(d)(2), a state court decision "based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." *Miller-El*, 537 U.S. 322 at 340; *see also Torres v. Prunty*, 223 F.3d 1103, 1107 (9th Cir. 2000).

United States District Court

For the Northern District of California

1    The California Supreme Court denied Petitioner's petition for review without comment

2  or citation to authority.  (Pet. Exh. C.)  In these circumstances, a district court "looks through"

3  the unexplained decision to the last reasoned decision as the basis for the state court's judgment.

4  *Boyd v. Newland,* 467 F.3d 1139, 1143 n.3 (9th Cir. 2006);  *Shackleford v. Hubbard*, 234 F.3d

5  1072, 1079 n.2 (9th Cir. 2000) (citing *Ylst v. Nunnemaker*, 501 U.S. 797, 803-04 (1991)).

6  Where the state court gives no reasoned explanation of its decision on a petitioner's federal

7  claim and there is no reasoned lower court decision on the claim, a federal court conducts "an

8  independent review of the record" to determine whether the state court's decision was an

9  unreasonable application of clearly established federal law.  *Plascencia v. Alameida*, 467 F.3d

10 1190, 1198 (9th Cir. 2006); *Himes v. Thompson*, 336 F.3d 848, 853 (9th Cir. 2003).  In the

11 instant case, the last reasoned decision relating to Petitioner's first claim was the California

12 Court of Appeal's decision filed September 25, 2002.  (Pet. Exh. A.)  The last reasoned decision

13 relating to Petitioner's second claim was the Alameda County Superior Court's decision

14 denying Petitioner's motions for mistrial on November 18, 1999.  (RT 2999-3004 and CT vol.

15 XII, Reporter's Augmented Transcript, November 22, 1999  ("11/22/99 RT") at 9-14, 39.)[2]

16                          **DISCUSSION**

17    Petitioner raises two claims for relief.[3]   The first claim alleges that the prosecutor's

18 intentional use of peremptory challenges to strike five black female venirepersons from his jury

19 violated his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United

20 States Constitution.  The second alleges that Petitioner's rights to due process and a fair trial

21 were violated when jurors committed misconduct and directed racial animus toward an African

22 American juror, when the trial court dismissed that juror from the panel, and when jurors

23 witnessed excessive force used against Petitioner when he objected to removal of the juror.

24

25 _____

26    [2]  Citations to "CT" are to the Clerk's Transcript in the state court appeal; citations to "RT" are to the Reporter's Transcript.

27    [3]  Petitioner conceded in his Traverse that the third claim raised in his Petition, based

28 on prosecutorial misconduct, fails under AEDPA's deferential standard of review.  (Traverse at 77.)

**United States District Court**
For the Northern District of California

I.      **Petitioner's Claim that Prospective Jurors Were Improperly Excluded on the Basis of Race Merits Habeas Relief.**

Petitioner's first claim is that the prosecutor used peremptory challenges to strike five black female prospective jurors on the basis of race in violation of Petitioner's rights under the Fifth, Sixth, Eighth and Fourteenth Amendments.[4]

Petitioner's trial began as a capital prosecution because he was charged with multiple murder special circumstance under California Penal Code § 190.2(a)(3).  Accordingly, each prospective juror filled out a 38-page questionnaire.  (CT 1830 *et seq*.)  After some potential jurors were excused for hardship or struck for cause by stipulation, counsel were permitted to question each individually.  (RT 528, 531-534, 608-09.)  The trial court allowed challenges for cause or by stipulation after each juror was questioned.  Voir dire lasted fourteen days.  (RT 566-1209.)  Once a pool of 50 prospective jurors was qualified, those 50 were placed in random order (of which counsel were informed).  (RT 1209, 1224-25.)  The first twelve jurors were seated, and counsel were permitted to exercise their peremptory challenges.  As each potential juror was excused, he or she was replaced with another person from the pool.

Defense counsel challenged the prosecutor's strikes as racially motivated after the prosecution had used three of its twelve peremptory challenges to strike African-American women:  Red 58, Red 6, and Black 35.[5]  (RT 1211-17.)  At that point, the defense had used one of its 14 challenges for an African-American male, and one black male, Red 55, remained in the box.  (RT 1217.)

---

[4] The Petition asserts that the prosecutor's use of peremptory challenges against five African-American jurors deprived Petitioner "of a fair jury trial, due process, and the equal protection of laws guaranteed by the Fifth, Sixth and Fourteenth Amendments to the United States Constitution."  (Pet. at 11.)  However, Petitioner has briefed the issue solely as a violation of the Equal Protection Clause under *Batson v. Kentucky*, 476 U.S. 79 (1986).  Accordingly, this Court limits its review of the issue as an alleged violation of the Equal Protection Clause under *Batson*.

[5] During the selection process, jurors were divided into groups that were labeled by color. On appeal, jurors were identified by their group color and a number, rather than by name.  The seated jurors and alternates were identified by seat number as well.

United States District Court

For the Northern District of California

The trial court stated that it was "not making a finding that the defense has made a *prima facie* showing at this time," but invited the prosecutor to place his reasons for the strikes on the record. (RT 1219.) The prosecutor responded:

> As to Juror Number Green 6, ... the black male excused by the defense, I would have left him on the jury.
> I intend to leave on the jury, if we reach that person, No. 51 in the random order. I can't remember her name, but a black female. She will undoubtedly serve on this jury if she is placed on this jury and not challenged by the defense.
> As to the three I have challenged, Juror No. Red 6, she is 70 years old. She is too old. She is very, very active in her church. Her church is against the death penalty. I don't like people that are very close to meeting their maker themselves. I think it puts a lot of pressure on them for voting for death.
> ...
> Red No. 58, No. 15 in the random order, she thinks domestic violence should be handled in the family. That was a question specifically placed on the questionnaire by the defense because they know a lot of my proposed aggravation is domestic violence.
> And I feel she wouldn't give much weight to that type of thing given she doesn't believe the police should intervene.
> At page 32 she indicated she would place – she is very interested in background information and she would place too much weight in it. With what little discovery I have from the defense, it indicates that is the only kind of mitigation they are going to offer, the Defendant's underprivileged background.
> As to Black 35, No. 7 in the random order, she lives with her sister. She indicates she is neither for or against the death penalty. She doesn't know how she would vote if it were on the ballot. She believes that the best argument against the death penalty is innocent people having it imposed upon them.
> She thinks eyewitness identifications are often weak and she thinks the greatest cause of crime in the community is racial prejudice.
> She gives money to the Black Adoption Fund and feels she was the victim of racism in the public schools growing up as a child.
> I think it is fairly obvious given those reasons my motivations for kicking her.

(RT 1219-1220.)

The trial court immediately denied the motion, stating that "[a]t this point, the *Wheeler* motion is denied. The court would find that the reasons given by the prosecution are neutral and not intended to exclude a cognizant [*sic*] group of people from the jury."[6] (RT 1220-21.)

---

[6] Petitioner's counsel challenged the peremptory strikes pursuant to *People v. Wheeler*, 22 Cal. 3d 258, 276-77 (1978), which prohibits, under the California Constitution, the use of racially motivated peremptory challenges. A *Wheeler* motion serves as an implicit objection under *Batson, supra. People v. Yeoman*, 31 Cal. 4th 93, 117 (2003).

The court resumed selection and the prosecutor challenged another African-American woman, Red 17.  (RT 1221.)  After a challenge from the defense, selection of the 12-juror panel was completed.  (*Id.*)  Four potential alternate jurors were selected.  The prosecution's next peremptory challenge was of a fifth African-American female, Yellow 77.  (RT 1222.)  The defense made a second *Wheeler* motion.  (*Id.*)  Again, the Court asked the prosecutor to state his reasons for the challenges "without making a finding any *prima facie* showing has been made."  (RT 1223.)  The prosecutor explained:

> Juror No. Yellow 77, she has three kids, one of whom is a model and one of whom is an artist, creative fields, yes, but not indicative of the type of up-bringing from someone who could, in fact, impose the death penalty.
> Her husband's a college professor so she is married to the type of person I find extremely reluctant to ever impose the death penalty.
> Her husband before that, I can't remember what he did, but she visited him in jail or prison.  Background information is extremely important to her and she feels innocent people are, in fact, executed.  So those are the reasons that I excluded.

(RT 1224.)

He continued by explaining that he knew prospective juror Black 11, whom he had rated "one of the five best jurors in the entire panel" would replace Yellow 77 if he challenged her, "so quite apart from race, I am entitled to use my peremptory challenges to select the best jurors I can."  (RT 1225.)   The prosecutor never discussed his reasons for challenging Red 17 on the record.[7]  Defense counsel argued that reasons relating to Yellow 77's family members did not indicate how she would perform as a juror.  (*Id.*)  The trial court then denied the second motion:

> For the reasons previously stated, the *Wheeler* motion is denied.  The court would find there are non race-related reasons for the exclusion of these jurors in the exercise of peremptory challenges.  There is no evidence to support the contention that the prosecution is trying to eliminate a cognizable group from the jury panel or alternates.

(RT 1225-1226.)

One black male (Red 55) remained seated. One black female (Red 36) was seated as alternate.  At the start of the trial, the jury (including the four alternates) consisted of two people

---

[7]   When defense counsel initially made the motion, she stated "Red 17 was dismissed and she was neutral with regard to all of her information contained within her questionnaire. I believe the people have already spoke[n] to her before we left chambers."  (RT 1223.)

9

United States District Court

For the Northern District of California

1    who listed their race as African-American, four listed as Hispanics, one as American Indian,

2    one who did not state her race, and eight Caucasian jurors.  (CT 15603 *et seq*.)

3          On review, the Court of Appeal found it was unclear whether the trial court had found a

4    *prima facie* case, and so simply considered whether the prosecutor's reasons for excusing the

5    five jurors were genuinely race-neutral. Petition, Exh. A at 11-12.  It described each challenged

6    juror and the prosecutor's justifications for challenge, but, following California law, declined to

7    engage in a comparative analysis of challenged and accepted jurors.  (Pet. Exh. A at 12 n.8.)

8    The Court of Appeal reasoned that

9
10          Appellant has not shown that the prosecutor's reasons were anything other than genuine,
       reasonably specific, race-neutral explanations that related specifically to this case. For
11          example, he challenged a juror who believed that domestic violence should be handled
       in the family. He felt that such people would not give sufficient weight to his proposed
12          showing of aggravating factors involving domestic violence. (*[People v. Box* (2000) 23
       Cal. 4th 1153, 1189] [low opinion of police or reluctance to call police are valid
13          factors].) This challenge is based on a potential specific bias directly related to the case
       at issue. (*People v. Martin* (1998) 64 Cal. App. 4th 378, 385 (*Martin* ).)

14          The prosecutor challenged jurors that he believed might have philosophical resistance to
15       imposing the death penalty, despite apparently neutral answers to some of the death
       penalty questions. For example, Black 35 did not know how she would vote if the death
16          penalty were placed on the ballot and she believed that the best argument against the
       death penalty was that innocent people may be put to death. [FN:  Appellant argues that
17          Black 35 answered that she was neutral toward the death penalty and was outraged by
       cases where someone received life imprisonment rather than death. Appellant's
18          argument ignores the fact that the juror's other responses indicated reservations that are
       supported by the record.  Also, the juror answered "no" to the written question regarding
19          feeling outraged when a murderer is sentenced to a penalty less than death.  During
       individual voir dire, counsel asked if she had ever heard about a case and thought "if
20          what they say is true about that guy, he deserves the death penalty for that."  She then
       said she had experienced that feeling.  Merely identifying support for a different or
21          conflicting statement by the juror does not require the trial court to reject the
       prosecutor's reasoning.] (*Martin, supra*, 64 Cal. App. 4th 378, 385 [exclusion based on
22          reservations about death penalty can be valid nondiscriminatory factor].)

23          In one case, a challenge was based on the fact that the potential juror's children were a
24       model and an artist and the husband taught in a college. The prosecutor believed that a
       juror who came from an artistic and academic family might be disinclined to impose the
25          death penalty. This is an acceptable reason. (*People v. Trevino* (1997) 55 Cal. App. 4th
       396, 411 [occupation of spouse may be a legitimate non-discriminatory factor]; *Wheeler,*
26          *supra*, 22 Cal. 3d 258, 275 [unconventional lifestyle is valid factor].)

27          The prosecutor also thought older, church-going jurors might be reluctant to vote for the
28       death penalty. This reason does not betray a racial bias. (*Martin, supra,* 64 Cal. App. 4th

10

United States District Court

For the Northern District of California

378, 385 [exclusion based on juror's beliefs is legitimate factor where beliefs may make juror uncomfortable sitting in judgment of another] .)

He also mistrusted jurors who were inclined to give significant attention to a defendant's background information. (*People v. Williams* (1997) 16 Cal. 4th 153, 191 [factors indicating sympathy for defendant are legitimate].) Some challenges were to potential jurors who mistrusted eyewitness identifications, thought policemen might lie, and had experience with relatives or spouses in jail or prison. (*People v. Irvin* (1996) 46 Cal. App. 4th 1340, 1354 [bias against eyewitness identification is valid factor]; (*Wheeler, supra*, 22 Cal. 3d 258, 275 [negative experiences with police or being crime victim are valid factors].)

(Pet. Exh. A at 17-19 (brackets and parentheses in original).)  The Court of Appeal concluded that "[i]n light of all the circumstances, substantial evidence supports the trial court's conclusion that the prosecutor's reasons for challenging the questioned jurors were race-neutral."  (*Id.* at 19.)

### A.    Legal Standard.

The Equal Protection Clause forbids the use of peremptory challenges to exclude jurors solely on account of their race.  *See Batson v. Kentucky*, 476 U.S. 79, 89 (1986).  *Batson* claims are evaluated using a three-step test.

First, the defendant must make out a *prima facie* case that the prosecutor exercised peremptory challenges on the basis of race by showing that prospective juror is a member of a "cognizable racial group" (here, African Americans),[8] that the prosecutor used a peremptory strike to remove the juror, and that the "totality of the relevant facts gives rise to an inference of discriminatory purpose."  *See Batson*, 476 U.S. at 93-94, 96.

---

[8] Although Petitioner repeatedly observes that the prosecutor challenged African-American women, *see, e.g.,* Traverse at 46 (arguing prosecutor struck 83% of eligible black female panelists), he has not explicitly argued that "African American women" are a cognizable group for *Batson* purposes.  Nor could  he.  The Court has identified no binding authority finding that groups defined by the intersection of race and gender are cognizable under *Batson*.  Even if this Court were to hold that African-American women are a cognizable group, that determination would be a new rule which could not be applied retroactively in this case.  *See Cooperwood v. Cambra,*  245 F.3d 1042, 1046 (9th Cir. 2001), *citing Teague v. Lane,* 489 U.S. 288, 305-06 (1989) (noting as of 2001, Ninth Circuit had declined to address whether "African American males" could be a cognizable group); *Tolbert v. Gomez,* 190 F.3d 985, 988 n.1 (9th Cir. 1999).

1       Second, if the requisite showing has been made, the burden shifts to the prosecutor to

2   articulate a race-neutral explanation for striking the jurors in question.  *Id.* at 97;  *Wade v.*

3   *Terhune*, 202 F.3d 1190, 1195 (9th Cir. 2000).   "[T]he prosecutor must give a 'clear and

4   reasonably specific' explanation of his 'legitimate reasons' for exercising the challenges."

5   *Batson*, 476 U.S. at 98 n.20. During step two, "the issue is the facial validity of the prosecutor's

6   explanation. Unless a discriminatory intent is inherent in the prosecutor's explanation, the

7   reason offered will be deemed race-neutral."  *McClain v. Prunty*, 217 F.3d 1209, 1220 (9th Cir.

8   2000).

9       This case turns primarily on the third prong of *Batson* analysis:  whether the defendant

10  has shown "purposeful discrimination."  *Batson*, 476 U.S. at 98;  *Wade*, 202 F.3d at 1195.[9]

11  After the prosecution sets out a race-neutral reason, the court must decide whether that reason

12  should be believed.  *Hernandez v. New York*, 500 U.S. 352, 365 (1991)(plurality opinion).  "In

13  deciding if the defendant has carried his burden of persuasion, a court must undertake a

14  sensitive inquiry into such circumstantial and direct evidence of intent as may be available."

15  *Green v. LaMarque*, 532 F.3d 1028, 1030 (9th Cir. 2008), *quoting Batson*, 476 U.S. at 93.   It

16  must evaluate the prosecutor's proffered reasons and credibility under the "totality of the

17  relevant facts," using all the available tools including its own observations and the assistance of

18  counsel.  *Mitleider v. Hall*, 391 F.3d 1039, 1047 (9th Cir. 2004), *cert. denied*, 545 U.S. 1143

19  (2005); *Lewis v. Lewis*, 321 F.3d 824, 831 (9th Cir. 2003).   For example, the court can evaluate

20  the persuasiveness of the justification:  "implausible or fantastic justifications may (and

21  _____

22      [9]   Petitioner argues at length that the trial court erred in failing to find a *prima*
    *facie* case of discrimination, and in doing so, applied a legal standard at odds with that
23  mandated by the Supreme Court in *Batson v. Kentucky*. (Pet. ¶¶ 16-17; Traverse at 38-44.)
    But "[o]nce a prosecutor has offered a race-neutral explanation for the peremptory
24  challenges and the trial court has ruled on the ultimate question of intentional discrimination,
    the preliminary issue of whether the defendant has made a prima facie showing becomes
25  moot."  *Hernandez*, 500 U.S. at 359;  *United States v. Esparza-Gonzalez*, 422 F.3d 897, 906
    (9th Cir. 2005) (same).  Thus, while the facts Petitioner cites in support of his argument
26  (such as statistical disparities) are relevant to whether the defense showed purposeful
    discrimination, the *prima facie* case inquiry is moot because the trial court proceeded to the
27  third step of *Batson* analysis.
         Both the trial court and Court of Appeal found all the prosecutor's explanations for
28  his strikes were race-neutral, thereby satisfying the second step of *Batson* analysis.  (RT
    1220-21, Exh. A at 17-18.)  Petitioner has not explicitly argued the justifications are race-
    based.

*United States District Court*
For the Northern District of California

probably will) be found to be pretexts for purposeful discrimination." *Purkett v. Elem*, 514 U.S. 765, 768 (1995) (*per curiam*).  Where the facts in the record are objectively contrary to the prosecutor's statements, serious questions about the legitimacy of a prosecutor's reasons for exercising peremptory challenges are raised.  *McClain,* 217 F.3d at 1221.

The Court's inquiry should also include "a comparative analysis of the jury voir dire and the jury questionnaires of all venire members, not just those venire members stricken."  *Green*, 532 F.3d at 1030; *Boyd v. Newland,* 467 F.3d 1139, 1145, 1150 (2006) (appellate court should engage in comparative juror analysis, which is the "centerpiece" of *Batson* inquiry).  "If a prosecutor's proffered reason for striking a [minority] panelist applies just as well to an otherwise-similar [nonminority] who is permitted to serve, that is evidence tending to prove purposeful discrimination to be considered at *Batson's* third step.  *Kesser v. Cambra,* 465 F.3d 351, 360 (9th Cir. 2006) (en banc) (quoting *Miller-El v. Dretke*, 545 U.S. 231, 241 (2005)).

The use of peremptory strikes for purposes of dismissing jurors on account of race is structural, and is not subject to harmless error review.  *Williams v. Woodford,*  396 F.3d 1059, 1069 (9th Cir. 2005) (holding that *Batson* violation is structural error); *Windham v. Merkle*, 163 F.3d 1092, 1096 (9th Cir. 1998) (holding that constitutional error in jury selection is structural).

### B.  Analysis.

Upon review of Petitioner's *Batson* claim, the Court concludes that California Court of Appeal's decision that the prosecutor's strikes of African-American jurors were not racially motivated was based on an unreasonable application of clearly established federal law, and on an unreasonable determination of the facts in light of the evidence presented.

> **1.    The State Courts Unreasonably Applied Clearly Established Federal Law by Failing to Engage in a Comparative Analysis of Similarly Situated Jurors.**

Neither the trial court nor the Court of Appeal undertook "a sensitive inquiry into such circumstantial and direct evidence of intent as may be available, including a comparative analysis of similarly situated jurors," as required by clearly established Supreme Court law at

United States District Court
For the Northern District of California

1    the time of the trial.  *See Green,* 532 F.3d at 1030 (citing *Batson*, 476 U.S. at 93, and *Miller-El*,

2    545 U.S. at 241 (internal quotation marks omitted)); *see also Kesser,* 465 F.3d at 360

3    (comparative juror analysis principles expounded in *Miller-El* have been clearly-established

4    Supreme Court law for AEDPA purposes since 1992).

5         The trial court's rote denials simply found that the prosecutor's proffered reasons were

6    race-neutral.  (RT 1220-21, 1225.)  The trial court stopped at the second stage of *Batson*

7    analysis, without making any attempt to examine the entire record for evidence of

8    discriminatory intent.

9         Just as in *Green*, the California Court of Appeal's analysis "did not remedy the trial

10   court's error," and similarly failed to reach step three of *Batson* analysis.  (Pet. Exh. A at 17-

11   19); 532 F.3d at 1028.  It merely listed the ostensibly race-neutral reasons the prosecutor

12   offered for each strike (or, in the case of Red 17, drew several explanations from her juror

13   questionnaire and voir dire), (Pet. Exh. A at 13-17), then cited case law which supported using

14   such reasons as legitimate grounds to strike a juror.  (*Id.* at 17-19.)  It found that "[t]he reasons

15   given by the prosecutor are supported by the record," (*id.* at 12), but considered only the

16   favorable portions of the questionnaires, voir dire, and transcript.  The court looked beyond the

17   prosecutor's stated rationale only in one instance, examining Black 35's statements about the

18   death penalty in voir dire and in response to juror questionnaires.  (*Id.* at 18.)  It explicitly

19   "declined" to "engage in a comparative analysis of the responses of challenged and accepted

20   jurors," *id.* at 12 n.8 – even though the Petitioner's briefs on appeal set out numerous side-by-

21   side comparisons of black panelists who were struck and nonblack panelists permitted to serve.

22   (Answer Exh. A, Appellant's Opening Brief on Appeal, filed November 26, 2001, at 29-74.)

23        The Court of Appeal failed to consider the "totality of relevant facts" which *Batson*

24   requires it to review.  *Kesser*, 465 F.3d at 360 ("totality of relevant facts" includes comparative

25   juror analysis).  By refusing to perform a comparative juror analysis and instead merely

26   "reiterating the prosecutor's stated reasons, and then finding they were race-neutral, without

27   analyzing the other evidence in the record to determine whether those reasons were in fact the

28

United States District Court
For the Northern District of California

14

United States District Court
For the Northern District of California

prosecutor's genuine reasons," the Court of Appeal did not perform its "affirmative duty to determine if the defendant had established purposeful discrimination." *Green,* 532 F.3d at 1031 (citing *Lewis v. Lewis,* 321 F.3d 824, 832 (9th Cir. 2003)).  Its decision was therefore an unreasonable application of clearly established federal law.  *See* 28 U.S.C. § 2254(d)(1); *see also Boyd*, 467 F.3d at 1151 ("[T]he California appellate courts' denial of Petitioner's request for ... a full comparative analysis of the venire unreasonably applied clearly established federal law").

Under these circumstances, this Court must conduct *de novo* analysis to determine whether the defendant established purposeful discrimination, rather than remanding for the state courts to do so.  *See Green*, 532 F.3d at 1031 (citing *Miller-El*, 545 U.S. at 241, and *Kesser*, 465 F.3d at 356-58); *see also Frantz v. Hazey,* 533 F.3d 724, 735 (9th Cir. 2008) (en banc).

Petitioner argues that the Court should not defer to the California courts' factual findings when it conducts *de novo* review.  (Pet. at ¶¶ 20-23, Traverse at 50-55.)[10]  Although *Miller-El* and its progeny require this Court to examine the entire record to see whether the prosecutor's  reasons for striking prospective jurors are genuine or pretextual,[11] the cases do not allow the Court to substitute its own judgment for that of state courts.  AEDPA's standard of review of the state courts' factual findings still applies.  In *Miller-El* itself, for example, the Supreme Court applied § 2254(d)(2) to find the state court's conclusion that challenges were nondiscriminatory "unreasonable as well as erroneous."  *Miller-El*, 545 U.S. at 240, 266.  In *Kesser*, the Ninth Circuit conducted a comparative analysis of each juror stricken, 465 F.3d at 361-371, and then concluded that "[a]lthough we must give deference to the California Court of

---

[10]  Petitioner also argues that no deference is warranted because the trial court summarily disposed of the motions with nearly identical rote denials, and failed genuinely to evaluate the prosecutor's justifications or test their genuineness by examining the entire record or questioning the prosecutor.  (Pet. at 24-26, Traverse at 50-55.)

[11]  S*ee e.g. Paulino v. Castro,* 371 F.3d 1083, 1090 (9th Cir. 2004) and cases cited therein (federal court examines *Batson* claims *de novo* when state court uses wrong standard to analyze whether defendant made a *prima facie* showing of bias); *Ali v. Hickman,* 2007 WL 2417377, *12 (N.D. Cal. August 24, 2007) (after finding that state court unreasonably applied federal law by failing to perform comparative juror analysis, court resolves the claim "without the deference that AEDPA otherwise requires" and reviews *de novo* whether the defendant established purposeful discrimination under *Batson).*

Appeal's findings of fact," the state court's "findings are unreasonable in light of the record

before it." *Id.* at 371; *see also id.* at 358 (findings unreasonable under § 2254(d)(2)).  Similarly,

in *Love v. Scribner*, 278 Fed. Appx. 714, 2008 WL 2066058 (9th Cir. March 19, 2008), the

Ninth Circuit found that the state court's refusal to engage in comparative juror analysis was an

unreasonable application of clearly established federal law under § 2254(d)(1), and remanded

the case for an evidentiary hearing.  *Id.* at *718.   Dissenting on the issue of whether evidentiary

hearing as warranted, Judge Graber noted:

> In this case we owe not only the usual high amount of AEDPA deference to a state
> court's findings, 28 U.S.C. § 2254(d)(2);  *Rice v. Collins*, 546 U.S. 333 (2006), but also
> an extra measure of deference for a *Batson*-related evaluation of credibility, *Hernandez
> v. New York*, 500 U.S. 352, 364 (1991). Applying those standards of review, on *de novo*
> review (which I agree is required here) I would affirm the decision of the district court
> and, therefore, respectfully dissent.

*Id.*   This Court therefore examines the record to determine whether the state courts' conclusion

that the strikes were not racially motivated was "objectively unreasonable in light of the

evidence presented in the state-court proceeding."  *Miller-El*, 537 U.S. 322 at 340,  *citing* 28

U.S.C. § 2254(d)(2).[12]

> **2.     The State Appellate Court Determination that the Prosecutor Struck
>          Jurors Yellow 77 and Red 58 for Race-Neutral Reasons was an
>          Unreasonable Determination of the Facts in Light of the Evidence.**

> **a.     None of the Prosecutor's Reasons for Striking Yellow 77 Is
>          Credible.**

Prospective juror Yellow 77 was a 54 year old African-American woman who lived with

her husband.  Judging from her questionnaire and voir dire responses, she should have been an

ideal prosecution juror.  As discussed more fully below, she was a former banker and business

owner.  She was moderately to strongly pro-death penalty.  (CT 10642.)  She vigorously held

---

[12]   The Court applies § 2254(d)(2), rather than § 2254(e)(1), where, as here,
"petitioner challenges the state court's findings based entirely on the state record."  *Kesser*,
465 F.3d at 358 n.1, *citing Taylor v. Maddox*, 366 F.3d 992, 999-1000 (9th Cir. 2004);
*Green*, 532 F.3d at 1031.

some pro-prosecution views: she had "strong" negative opinions about drug dealers,[13] (CT 10626), and was one of the very few panelists who thought it was *not possible* for a peace officer to lie, because "I believe that officers primarily stand for the truth." (CT 10631.)

In response to the defense motion, the prosecutor gave five reasons for challenging Yellow 77. Not one is persuasive.

First, the prosecutor reasoned that "she has three kids, one of whom is a model and one of whom is an artist, creative fields, yes, but not indicative of the type of up-bringing from someone who could, in fact, impose the death penalty." (RT 1224.) The Court of Appeal found that this reason was genuine and that he believed that "a juror who came from an artistic and academic family might be disinclined to impose the death penalty." (Pet. Exh. 1 at 18.)

This concocted justification is not only implausible, but contradicted by the record in nearly every respect. Yellow 77's questionnaire in fact indicates that the professions of her three children are "self-employed," "loan officer," and "model/car sales," and that only the spouse or partner of one of her children was an artist. (CT 10613.) Even assuming the prosecutor made an innocent error, his reasoning – that the career choices of Yellow 77's adult children in their late twenties and mid-thirties reveal their "upbringing," and that their "upbringing" in turn reveals how Yellow 77 would vote on the death penalty – is too attenuated to bear any weight.

The prosecutor's reliance on the fact that Yellow 77 was married to a "college professor" – "the type of person I find extremely reluctant to ever impose the death penalty," (RT 1224), is similarly faulty. Yellow 77's husband was a Food Service Instructor who had been teaching "Dining Room Services" for one year at a community college. (CT 10610.) There is no reason why her husband's position, which few would consider genuinely academic, shows Yellow 77 herself would be unwilling to vote for the death penalty.[14] If anything, her

---

[13] This was important for the prosecution because the prosecutor planned to presented evidence that Petitioner was a drug dealer. (*See* RT 1292 (opening statement).)

[14] Nor did the prosecutor make any connection between her spouse's profession and any aspect of the case. *Cf. United States v. Biaggi*, 673 F. Supp. 96, 106 (E.D.N.Y. 1987). *aff'd*, 853 F.2d 89 (2nd Cir. 1988) (prosecutor permissibly struck prospective juror whose wife worked at a printing company in Long Island, where the defendant had close ties to that

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

own employment history would be more telling.  Although the Court of Appeal characterized her as a "homemaker," she had previously owned her own business, and before that had been an "AVP/manager" at a bank for 15 years – not a profession associated with opposition to the death penalty.  (CT 10611.)

Respondent argues that the prosecutor's family-based justifications were "obviously *most* important" to him.  (Answer at 24.)  But these speculative rationales, offered to show Yellow 77 might be reluctant to impose the death penalty, are flatly contradicted by her actual questionnaire and voir dire responses.  Yellow 77 wrote she thought the death penalty was "sad" but "necessary," and indicated that she was both "moderately in favor" and "strongly in favor" of the death penalty.  (CT 10638.)  Asked at voir dire whether she saw herself as someone who could impose the death penalty, she answered without equivocation "yes."  (RT 1030-31; *see also* CT 10641.)  She "strongly" disagreed with the statement "Anyone who intentionally kills another person should never get the death penalty."  (CT 10642.)  While many jurors wrote that they disagreed "somewhat," or explained that circumstances would matter to them,[15] Yellow 77 wrote simply "I am not against the death penalty."

The Court rejects these rationales because they are implausible, inaccurate, and contradicted by the record.  *Cf. Lewis v. Lewis*, 321 F.3d 824, 830 (9th Cir. 2003) ("[I]f a review of the record undermines the prosecutor's stated reasons, or many of the proffered reasons, the reasons may be deemed a pretext for racial discrimination."); *Johnson v. Vasquez*, 3 F.3d 1327, 1330-31 (9th Cir. 1993) (court rejects prosecutor's proffered rationales when they are erroneous or unsupported by the record).

Second, the prosecutor also stated that he struck Yellow 77 in part because she had visited her ex-husband in jail after he had been convicted of a drunk driving offense.  (CT 10622-23; RT 1224.)  The prosecutor made no connection between the fact that she had been in

---

industry in that location).

[15] *See, e.g.,* Blue 67 (Juror No. 2) "Again – It's important to weight he circumstances and gravity of the way the crime was committed," (CT 15677); *see also* Blue 7 (Juror No. 4) "There could be a particularly heinous crime for which the death penalty is justified." (CT 15755.)

18

a jail (or that her ex-spouse had been convicted) and her ability to serve as an impartial juror. Numerous seated jurors and other panelists whom the prosecutor did not challenge[16] gave similar or nearly identical responses. For example, prospective juror Yellow 23 had a brother who was convicted of drunk driving, and had also visited him in jail. (CT 10738-39.) Blue 67 (Juror No. 2) had visited a detention facility, and her mother had been convicted of a DUI. (CT 15656-57; *see also* Black 31 (Alternate) CT 16082-83 (brother involved in a marijuana offense; had been in a detention facility).)[17]

The Ninth Circuit found a similar rationale pretextual under nearly the same circumstances in *Green*, *supra*. There, the prosecutor stated he struck a juror because she had visited her stepfather twice in prison, but he did not strike white jurors whose relatives and friends had also been arrested, indicted, or convicted. 532 F.3d at 1031-33. The record showed that the juror thought her stepfather had been treated fairly, and she said there was no reason she could not be impartial. *Id.* at 1032. Here, too, Yellow 77 wrote she felt the prosecution of her ex-husband was handled "smoothly," and that there was nothing that would affect her ability to be impartial. (CT 10622, 10642.) Finally, the *Green* court noted that "[t]he State's failure to engage in any meaningful voir dire examination on a subject the State alleges it is concerned about is evidence suggesting that the explanation is a sham and a pretext for discrimination," 532 F.3d at 1033 (quoting *Miller-El*, 545 U.S. at 246), and was swayed by the fact that the prosecutor had not asked the white jurors whom he did not strike about their relatives and friends who had been arrested and convicted. *Id.* at 1031-32. In this case, the prosecutor never asked either Yellow 77 or any of the similarly situated jurors about convictions, detention facilities, or anything remotely related to this rationale. (RT 1030-31 (Yellow 77); RT 1027-28 (Yellow 23) RT 899-902 (Blue 67); RT 1090-91 (Black 31).)

---

[16]    After the first 12 prospective jurors were called to the box, the prosecution and defense challenged eight jurors before the prosecutor passed a turn to challenge. RT 1210-1212. Accordingly, those jurors who remained in the box, or who were later called into the box whom the prosecutor did not challenge, were presumably acceptable to him.

[17]    In addition, Red 55, the African-American panelist seated as Juror No. 12, had been convicted of forgery and had been in detention facility. (CT 16043-44.)

United States District Court

For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12

13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Third, the prosecutor relied on the fact that Yellow 77 wrote that the defendant's background information was important to her.  In fact, Yellow 77's responses on this topic were mixed:  she noted that personal information was "very important" to her in determining whether someone should be sentenced to death or life without parole, (CT 10639), but she also wrote that background information was "possibly" important, "just to make sure that all the facts are understood, and have been presented."  (CT 10641.)  And at voir dire, she retreated even further: when asked whether she thought background information was very important, she answered:

> Not necessarily.  But I noted a lot of times those kind of things can influence why individuals behave a certain way.  But it wouldn't necessarily influence my opinion either way.

(RT 1033.)

Moreover, nearly half of the seated jurors and alternates indicated unequivocally that the defendant's background would be "very important" to them.  (*See* Blue 67 (Juror No. 2) CT 15674;  Blue 72 (Juror No. 3) 15713;  Red 44 (Juror No. 5) CT 15789; Yellow 36 (Juror No. 6) CT 15828;  Green 43 (Juror No. 9) CT 16213; Yellow 73 (Juror No. 11) CT 16021; Black 31 (Alternate) CT 16099.)  Another quarter thought it was "somewhat important."  (Blue 5 (Juror No. 7) CT 15867; Black 69 (Juror No. 8) CT 15906; Black 10 (Juror No. 10) CT 15983; Black 29 (Alternate) CT 15635.)  Although the Court of Appeal concluded that the prosecutor "mistrusted jurors who were inclined to give significant attention to a defendant's background information," (Pet. Exh. 1 at 18), the opinions of seated jurors to whom he did not object flatly contradict that finding.

Fourth, the prosecutor observed that Yellow 77 thought that "innocent people might be executed."  But the record shows even that was not a genuine ground for disqualification in the prosecutor's mind: he failed to challenge Yellow 23, for example, who referred in her questionnaire to "mess-ups – possibility of innocence."  (CT 10754.)  In light of Yellow 77's firmly articulated pro-death penalty stance, discussed above, this reason rings hollow.

20

United States District Court
For the Northern District of California

1   Respondent argues that the Court should not engage in such factor-by-factor

2   comparative analysis: although Yellow 77 may have shared individual characteristics cited by

3   the prosecutor with unchallenged or seated jurors, it was the combination of these four factors

4   that led him to strike her, and no other juror shared even three, much less all four, of these

5   characteristics.  (Answer at 24.)  However, the Supreme Court explicitly rejected the reasoning

6   that a juror is not "similarly situated" for the purposes of comparative analysis unless he or she

7   matches all the reasons the prosecution gave for striking a potential juror:

8       None of our cases announces a rule that no comparison is probative unless the situation
        of the individuals compared is identical in all respects, and there is no reason to accept
9       one. Nothing in the combination of Fields's statements about rehabilitation and his
        brother's history discredits our grounds for inferring that these purported reasons were
10      pretextual. A per se rule that a defendant cannot win a *Batson* claim unless there is an
        exactly identical white juror would leave *Batson* inoperable; potential jurors are not
11      products of a set of cookie cutters.

12  *Miller-El,* 545 U.S. 231, 247 n.6; *see also Green,* 532 F.3d at 1030 n.3 ("[t]wo jurors do not

13  have to have all the same characteristics to be similarly situated").  Courts regularly examine

14  each justification for striking a juror, both to see if it is supported in the record and to see if

15  other jurors with the same characteristic were retained.  *See*, *e.g.*, *Kesser*, 465 F.3d at 366 (the

16  law does not require the court to compare jurors whose situations match exactly) and 362-371

17  (comparing individual characteristics).

18      Finally, the prosecutor argued that he struck Yellow 77 because he knew that Black 11,

19  whom he had ranked one of the five best prosecution witnesses on the panel, would be called

20  next.  The Court finds this justification profoundly unpersuasive for several reasons.[18]  First, if

21  Black 11 was one of the five best prosecution witnesses on the panel, then it was utterly

22  predictable that the defense would exercise a peremptory challenge on that panelist – which the

_____

[18]  The one advanced by Petitioner is not among them, however.  Petitioner argues
that had the prosecutor's real goal been to get Black 11 into the box, he would have
eliminated Yellow 37 or Black 29, who were far less favorable to the prosecution.  But
although those jurors' questionnaires had some pro-defense responses, they were not less
favorable overall to the prosecution than Yellow 77.  *See, e.g.,* questionnaire of Black 29
(chemist who thought police were capable of lying and eyewitness identifications were not
accurate, but also was a registered Republican who believed "individual malfeasance" was
the greatest cause of crime and was moderately in favor of the death penalty).  (CT 15604-
15640.)

21

defense in fact promptly did.  (RT 1226.)  The prosecution had no real hope of keeping Black 11 on the jury; at that point, the court was choosing alternates, and each party had three peremptory challenges left.  *Id.*[19]  Where, as here, a prosecutor has offered several pretextual explanations for his strike, his credibility is undercut.  *Kesser*, 465 F.3d at 369; *see also McClain,* 217 F.3d at 1221 ("The fact that one or more of a prosecutor's justifications do not hold up under judicial scrutiny militates against the sufficiency of a valid reason");  *United States v. Chinchilla*, 874 F.2d 695, 699 (9th Cir. 1989) (where court is left with two acceptable bases for challenge that would ordinarily be adequate taken at face value, "the fact that two of the four proffered reasons do not hold up under judicial scrutiny militates against their sufficiency.")  The Court cannot credit this implausible rationale for striking Yellow 77 in light of the prosecutor's four other obviously pretextual justifications.

Overall, the reasons the prosecutor gave for striking Yellow 77 are not credible: they are either irrational, contradicted by the record, or belied by the prosecutor's unwillingness to reject other jurors who share the same characteristics.

### b.    None of the Stated Reasons for Striking Red 58 is Credible.

The prosecutor gave only two reasons for striking Red 58, another female African-American panelist.  He argued that Red 58

> thinks domestic violence should be handled in the family.   That was a question specifically placed on the questionnaire by the defense because they know a lot of proposed aggravation is domestic violence.
> And I feel she wouldn't give much weight to that type of thing given she doesn't believe the police should intervene.

(RT 1219-1220.)  The prosecutor also claimed Red 58 was "very interested in background information and would place too much weight in it."  (RT 1220.)

In her questionnaire, Red 58 responded "yes" to the question "have you ever experienced domestic violence in your home, either as a child or as an adult," and wrote that she thought family violence should be handled entirely within the family "[b]ecause I was raised

---

[19]  The prosecutor did not argue that there was some other favorable panelist in the pool who might remain if the defense were forced to use a challenge on Black 11.

that way." (CT 2290.) Even if this response could reasonably construed as one indicating that she would not "give weight" to aggravating evidence of domestic violence, the rest of the record shows that this rationale is pretextual.

The prosecutor never asked Red 58 about her questionnaire response, her personal experience with domestic violence, or her opinions of it. (RT 758-765.) As set out above, the Supreme Court teaches that the government's failure to address a subject at voir dire is evidence of pretext. *Miller-El*, 545 U.S. at 246. Moreover, the rest of the voir dire, together with the other questionnaires, shows that jurors' views on family violence were not even on the prosecutor's radar. He did not ask even one of the prospective jurors placed in the box about the issue – even though some similarly indicated they thought some or all domestic violence should be handled entirely within the family. Red 55, the African American male seated as Juror No. 12, wrote that domestic violence should be handled entirely within the family "because in most cases it can be settle," (CT 16033), but at voir dire, the prosecutor asked him only about where he lived, about drug dealing in his neighborhood, his feelings about the death penalty. (RT 745-47.) Black 69 (Juror No. 8) answered both "yes" and "no," to the question about how domestic violence should be handled, and wrote an incomplete explanation: "depends on the extent of the family violence, some instances can call for a separate party to" [*sic*]. (CT 15879; RT 1182-1184 (no family violence questions).)

Other seated jurors or panelists whom the prosecutor did not challenge wrote answers which raised questions about whether they consider all domestic violence serious or criminal, but the prosecutor never questioned them on the topic either. (*See* Green 43 (Juror No. 9) (family violence should not be handled entirely within the family "[i]f it is physically harmful or abusive," CT 16187; RT 933 (no questions by either side on any topic)); unchallenged prospective juror Black 11 ("if it can be handled, OK, if it becomes physical abuse, then they need help," CT 13727; RT 1094-1101 (no domestic violence questions); Yellow 73 (Juror No. 11) ("family therapy can be of help in understanding and resolving violent situations," CT 15995; RT 1001-1002 (no domestic violence questions)); Black 29 (outside involvement appropriate "[a]t some level of seriousness," CT 15608; RT 1101-1103).) Still other seated or

**United States District Court**
For the Northern District of California

1   unchallenged jurors wrote that they had experienced domestic violence at home, but were never

2   questioned about it.  (*See* Black 31 (Alternate) CT 16072, RT 1089-1091; Blue 5 (Juror No. 7,

3   CT 15840) RT 817-818;  Yellow 23, CT 10728, RT 1026-1029; Black 10 (Juror No. 10) CT

4   15957, RT 1170-1172; Green 32, CT 7808, RT 940-942; Green 14, CT 8430, RT 919.)

5       The only other reason offered by the prosecutor was that he felt Red 58 was "very

6   interested" in background information and might place too much weight on it.  But again, nearly

7   half the seated jurors and alternates noted that the defendant's background would be "very

8   important" to them when the considered penalties, and another quarter believed it was

9   "somewhat important."  (*See* discussion of Yellow 77 *supra*.)

10      Neither reason given by the prosecutor for striking Red 58, therefore, is convincing.

11  Although the Court of Appeal listed several other questionnaire responses which might indicate

12  a pro-defense stance (such as her views on police officers) when it described her, "the question

13  is not whether the prosecutor might have had good reasons" for the challenges, but what his real

14  reasons were. *Williams v. Runnels,* 432 F.3d 1102, 1109 (9th Cir. 2006).  The fact that "record

15  contained evidence for each juror that would support peremptory challenges on

16  non-objectionable grounds" is insufficient.  *Id.*  A prosecutor must "state his reasons as best he

17  can and stand or fall on the plausibility of the reasons he gives ....  If the stated reason does not

18  hold up, its pretextual significance does not fade because the trial judge, or an appeals court,

19  can imagine a reason that might not have been shown up as false." *Miller-El*, 545 U.S. at 250-

20  52; *see also Paulino v. Castro,* 371 F.3d 1083, 1090 (9th Cir. 2004) (same).

21      Red 58 was otherwise an unremarkable panelist.   She believed that drugs were the

22  greatest cause of crime in the community, and had strong negative opinions about drugs and

23  drug sales.  (CT 2302-04.)  Although she had had negative experiences with police officers and

24  felt "violated" by them, the prosecutor did not cite this as a ground for rejecting her, and she

25  wrote that it did not affect her opinion of the criminal justice system.  (CT 2302.)  Like the vast

26

27

28

24

United States District Court

For the Northern District of California

1  majority of seated jurors, she thought it possible that a peace officer might not tell the truth,[20]

2  and did not think all eyewitness identifications were accurate.  (CT 2308-09.)  She was

3  moderately in favor of the death penalty, felt that the death penalty should automatically be

4  imposed for "murder for no reason,"  would vote to maintain it, and believed she could impose

5  it.  (CT 2316-19.)  At voir dire, although some of her initial answers were vague, Red 58

6  concluded she saw herself as someone who could vote for the death penalty.  (RT 764-65.)

          **c.**     **Other Circumstantial Evidence Shows the Prosecutor was Motivated by Discriminatory Intent.**

          **i.**     **Statistical Evidence.**

     The bare statistical evidence in this case also suggests the prosecutor's challenges of

Yellow 77 and Red 58 were  race-based.  A  disparity between the racial composition of the

jurors removed by the state with peremptory strikes and the racial composition of the pool of

jurors can raise an inference of discrimination, *see Boyd v. Newland,* 467 F.3d 1139, 1147 (9th

Cir. 2006); *Turner v. Marshall,* 63 F.3d 807, 812-813 (9th Cir. 1995), *overruled on other

grounds, Tolbert v. Page*, 182 F.3d 677 (9th Cir. 1999) (en banc) (five of nine African

Americans in pool stricken).  In addition, the fact that the prosecution used a significant

percentage of its peremptory challenges against African Americans can raise an inference of

discrimination.  *See e.g. Fernandez v. Roe*, 286 F.3d 1073, 1078 (9th Cir. 2002) (finding *prima

facie* case where prosecution used 21% of its challenges against Hispanic prospective jurors,

who represented only 12% of the juror pool); *Turner*, 63 F.3d at 813 (30% of panelists who

appeared for voir dire were African American, but government used 56% of peremptory

challenges against African Americans).

     Here, the prosecutor struck 63% of African Americans in the pool of jurors considered

(5 of 8), but only 22% of non-black prospective jurors (9 of 41).  Moreover, while only 16% of

---

[20]  Only three seated jurors and alternates thought it was not possible for a peace
officer to lie:  Blue 7 (Juror No. 4), CT 15744, Green 42 (Juror No. 9) CT 16206, and Yellow
72 (Juror No. 11).  (CT 16013.)  Red 55 marked "no" in response to the question of whether
it was possible for a peace officer not to tell the truth, but his explanation, "because he or she
is human," indicates he meant "yes."  (CT 16052.)

United States District Court

For the Northern District of California

the potential jurors were black (8 of 49)[21], the prosecutor used 36% percent of his challenges against African American panelists. (CT 1830-16219 (juror questionnaires).) Although the sample size is small, *cf. Wade v. Terhune,* 202 F.3d 1190, 1198 (9th Cir. 2000), the statistical disparities here are as great as those found to raise an inference of discrimination in the cases cited above.

### ii.       Strikes of Other Jurors.

The prosecutor's unconvincing arguments offered to explain his strikes of other African-American panelists are further evidence of his discriminatory animus.

The prosecutor's genuine motives for striking the other jurors at issue in this *Batson* claim – Black 35, Red 17, and Red 6 – are not as clear as those driving his strikes of Yellow 77 and Red 58; as set out below, there may have been at least some genuinely race-neutral reasons for striking them.[22] The Court need not decide the *Batson* claims with respect to these jurors, however, because "just one racial strike calls for a retrial." *Green*, 532 F.3d at 1033, *quoting Kesser,* 465 F.3d at 369. Nonetheless, many of his reasons for striking Black 35 and Red 17 were pretextual or even, in one case, a proxy for race.[23] The prosecutor's treatment of other

---

[21]   The Court notes that although 50 jurors were in the pool, but only 49 were actually called and considered.

[22]   Neither the Supreme Court nor the Ninth Circuit has decided whether a strike is permissible if it is motivated by both legitimate and illegitimate reasons ("mixed motive" analysis), or whether reliance on one discriminatory reason taints the entire strike. *See Kesser*, 465 F.3d at 358; *Cook v. La Marque,* 2008 WL 1701690, *2 (E.D.Cal. April 9, 2008) (surveying cases).

[23]   Neither of the reasons the prosecutor articulated for striking Red 6 was obviously incorrect or pretextual. The first was that Red 6 was 70 years old. Although his rationale was unclear, he presumably meant that prospective jurors faced daily with their own mortality might have difficulty imposing the death penalty. No juror was as old as Red 6; only two seated jurors and one other panelist whom the prosecutor did not challenge were in their mid or late sixties (Red 55, the African-American male seated as Juror No.12, was 69, (CT 16030), Blue 8 was 66, (CT 6720), and Blue 7 (Juror No. 4) was 63. (CT 15722.) A review of the record reveals that the vast majority of panelists who were acceptable to the prosecutor were in their twenties, thirties, and forties. Moreover, apparent age, health, and frailty – whether a panelist seems close to "meeting their maker" – does not strictly correspond to numerical age, and is not readily apparent from the dry record. Deference to the trial court's judgment is therefore particularly appropriate.
    The prosecutor's second reason for rejecting Red 6 – that she was "very, very active in her church," (RT 1221), was also not clearly pretextual. Red 6 wrote that she enjoyed spending her free time in "church activities" and football, and that she volunteered in reading

(continued...)

United States District Court
For the Northern District of California

1    prospective jurors serves as further evidence of discriminatory animus, even if the Petitioner

2    cannot show the strikes were entirely motivated by race, because the prosecutor's "willingness

3    to make up nonracial reasons for striking [other jurors] makes it even harder to believe that his

4    reasons for striking [Yellow 77] were race-neutral." *See Kesser*, 465 F.3d at 369.

5                                    **a.    Black 35.**

6          Most of the prosecutor's reasons for striking juror Black 35, a 37 year old African

7    American woman, were either pretextual or a transparent proxy for race.

8          The prosecutor first explained that he struck Black 35 because she lived with her 42 year

9    old sister.   He never explained how Black 35's living arrangements could be relevant to the

10   facts of the trial, or explained how the fact that she lived with her sister might affect her

11   approach to the trial or ability to serve as a juror. *See Boyde v. Brown,* 404 F.3d 1159, 1171

12   (9th Cir. 2005) (court may considers relevance to trial and nexus between juror's characteristic

13   and approach to trial to evaluate the persuasiveness of explanation).   Moreover, nearly every

14

15   _____

          [23](...continued)

16   programs at her church. (CT 3587.)  She noted she knew a local judge because she had
     "known him as a child growing up in our church." (CT 3596.)  Her questionnaire responses

17   asking directly about the death penalty were conflicting:  in response to the first question
     about whether any of her "religious beliefs, moral feelings, or philosophical principles

18   interfere with your ability to sit in judgment of another person" – a question asked directly
     after the question about her church affiliation – Red 6 marked "yes" and wrote "my feelings

19   are to judge honestly The death penalty – I do not believe in" [*sic*]. (CT 3587.)  After 25
     pages of questionnaire, however, in response to a second question about whether she had any

20   religious, moral or philosophical views that would affect her ability to impose the death
     penalty, she marked "no." (CT 3613.)  She then marked that she was "moderately in favor"

21   of the death penalty, would vote to maintain it, and had felt a sense of personal outrage on
     hearing that a convicted murderer was sentenced to a penalty of less than death. (CT 3612.)

22   Asked how her religious organization viewed the death penalty, she explained "[t]he church
     says there should be forgiveness and taking a life is not the answer." (CT 3614.)  But she

23   also wrote that she did not feel obligated to accept that view. (*Id.*)
          Although several other seated and unchallenged jurors were involved in church

24   activities, none was as active.  Black 29 (Alternate) was involved with an evangelical church,
     and volunteered his time "teaching youth at church." (CT 15610.)  As a youth, he had

25   visited a detention facility as part of a church activity. (CT 15619.)  Black 69 (Juror No. 8)
     was "raised as [a] Jehovah's Witness but not 100% active in all activities."  She wrote that

26   her church's view was that "they believe that God is the only one to decide the fate of a
     human being he is the only judge of life/death," but also marked that she did not feel obliged

27   to accept that view. (CT 15908.)  Yellow 37 (Alternate) attended Catholic church
     "frequently." (CT 16113.)  Black 10 (Juror No. 10) wrote he "tries to attend church

28   regularly." (CT 15959.)
          On this record, the state courts' findings that the prosecutor challenged  Red 6 for
     race-neutral reasons were not unreasonable.

prospective juror called into the box lived with some family member or partner.   Several jurors whom the prosecutor did not challenge or who were actually seated had similarly nontraditional living arrangements.   Green 43 (Juror No. 9), a 39 year old woman, lived with a 35 year old roommate.  (CT 16184, 16188. )  Blue 72 (Juror No. 3) lived with her partner and partner's sister.  (CT 15687.)  Green 6 lived with his wife, adult cousin, and son.  (CT 7692.)  Yellow 36 (Juror No. 6), a 23 year old man, lived with his parents.  (CT 15798, 15802.)

The prosecutor also pointed to the fact that Black 35 stated she would not believe that all eye-witness observations are accurate because "there is room for human error."  (CT 13280.) But only *one* seated juror believed all eyewitness testimony was accurate.  (Yellow 73, Juror No. 11, CT 16014).   The others all expressed the same reservations about eyewitness testimony.  *See, e.g.,*  Red 73 (Juror No. 1) ("eyewitness observations can be clouded by too many factors") CT 16169; Red 44 (Juror No. 5)("because people's perceptions are not always the same") CT 15782; Black 31 (Alternate) ("any 2 people may see the same event and interpret it in different ways") CT 16092; Black 69 (Juror No. 8) ("different people see things differently, however, another person might have seen the same thi [*sic*] a little differently") CT 15899; Black 10 (Juror No. 10) ("not all, it depends on circumstance") CT 15976; Yellow 37 (Alternate) ("Perceptions. We all see things differently") CT 16131; Yellow 36 (Juror No. 6) ("few people have 'total recall,' 'facts' may change over time") CT 15821.)   "The fact that [a given] reason also applied to these other panel members, most of them white, none of them struck, is evidence of pretext."  *Kesser*, 465 F.3d at 367 (quoting *Miller-El*, 545 U.S. at 248).

The prosecutor also stated he struck Juror Black 35 in part because she "thinks the greatest cause of crime in the community is racial prejudice. She gives money to the Black Adoption Fund[,] and she feels she was the victim of racism in the public schools growing up as a child."  (RT 1220.)  He explained it was "fairly obvious given those reasons" why he used a peremptory challenge.  (*Id.*)

Even assuming that these rationales are race-neutral, the Court finds that they are, taken together (as the prosecutor offered them), a proxy for race.   Respondent argues that "a

perception of racial prejudice on the part of a juror is a valid reason for a peremptory challenge," citing *Tolbert v. Gomez*, 190 F.3d 985, 989 (9th Cir. 1989).  (Answer at 21.)  The juror's concerns about racism in *Tolbert* are fundamentally distinguishable, however.  In *Tolbert,* a prospective juror asked to approach the bench and expressed his "concern regarding the potential of racist attitudes of juries" and his "views on the importance of race in the evaluation of individual guilt."  *Id.* at 989.  The Ninth Circuit found that the prosecutor's reliance on the juror's opinions about race and racism were not pretextual:  they were not peculiar to any racial group, nor did they stand as a proxy for race.  *Id.*  The court concluded that "[c]hallenging a prospective juror on the basis of his expressed opinions about the judicial system does not violate *Batson*."  *Id.*; *see also United States v. Steele*, 298 F.3d 906, 914 (9th Cir. 2002) (holding that the prosecutor could legitimately strike a juror who believed race discrimination tainted the criminal justice system).

But what Respondent refers to as Black 35's "racially tinged comments,"  Answer at 21, add up to more than the mere perception of racial bias discussed in *Tolbert* and *Steele*.   A concern about racist attitudes of juries was "a characteristic that is peculiar to any race." *Tolbert*, 190 F.3d at 989.  Here, on the other hand, while each factor taken alone is potentially race-neutral (a white juror could feel she was the victim of racism or donate to the Black Adoption Fund), it would require willful intellectual blindness for the Court to conclude that a juror's combined experience of racism, concern about racism, and support of an African-American charity do not correlate to race.

*Batson* holds quite simply that a black juror cannot be removed on the assumption that she will be biased in favor of a black defendant.  476 U.S. at 89.  For the prosecutor to suggest that Black 35's "attitudes" – that is, support of a black charity and an awareness and experience of racism in general, not with respect to the criminal justice system, as in *Tolbert* and *Steele* – could "taint her judgment" is tantamount to saying that she could not be impartial because of her race.

29

United States District Court

For the Northern District of California

Even if the "racially tinged" responses are not a proxy for race, Black 35's alleged "perception of racial prejudice" in her own life and her community is pretextual here.  The prosecutor said that Black 35 felt she was a "victim of racism as a child," but this is a grossly exaggerated version of her actual questionnaire response:  Question 5(b) asked whether the prospective juror had ever been "exposed to person who exhibited racial, sexual, religious, and/or ethnic prejudice," and Black 35 wrote that she "overheard my 1st grade teacher ask another how many of 'them' she had (meaning Blacks)[;] she treated me differently."  (CT 13259.)  Moreover, the prosecutor did not challenge other jurors who had either witnessed prejudice or experienced it themselves.   Blue 72 (Juror No. 3) wrote she had been exposed to prejudice "from patients, some ancillary staff – usually from 'older' persons."  (CT 15685.)  Juror Red 73, who was seated as a juror but later excused for hardship,  responded to the same question about exposure to prejudice that "some people share their predudices [sic] by making 'comments.'"  (CT 16149.)  Yellow 36 (Juror No. 6) wrote that "<u>most</u> people seem to exhibit [prejudice] eventually, in my experience."  (CT 15800.)  Yellow 37 (Alternate No. 4), was exposed to prejudice from "friends, peers, family, strangers."  (CT 16110; *see also* Yellow 73 (Juror No. 11), CT 15994 (previous boss made racial and sexist jokes); Black 31 (Alternate No. 3) ("not all people like all people").)   The prosecutor's failure to strike these jurors tends to show he reasoned a non-black juror could be impartial even if he or she had a "perception of prejudice," but that a black juror with the same perception would be biased.  This is an impermissibly discriminatory rationale for striking Black 35.

Finally, the prosecutor said he challenged Black 35 in part because she "is neither for or against the death penalty," she didn't know how she would vote if it were placed on the ballot, and "she believes that the best argument against the death penalty is innocent people having it imposed upon them."  (RT 1220.)[24]   There was at least one seated juror, Blue 72 (Juror No. 3)

_____

[24] Petitioner argues that record does not support a finding that she was "merely neutral."  She did confirm both in her questionnaire and at voir dire that she could impose the death penalty, (CT 13288; RT 1196), and noted at voir dire that had been occasions when she believed certain criminals deserved the death penalty.  (RT 1198.)  Yet the vast majority of her responses were consistently neutral.

whose death penalty responses were indistinguishable from those of Black 35, or even slightly more opposed to the death penalty. She wrote she was "moderately against" the death penalty, (CT 15712), and was "not sure" if she would vote for the death penalty were it on the ballot. (CT 15713.)  Another seated juror, Blue 7 (Juror No. 4) was ambivalent, or at least conflicted.[25] The other seated jurors were far less equivocal, however.[26]

The Court finds that the prosecutor's belief that Black 35 was "neutral" on the death penalty is the sole even marginally credible rationale he gave for striking her. Were this Court deciding the *Batson* claim without AEDPA's deferential standard of review, it would find that the prosecutor's clearly pretextual or invalid reasons fatally undermine his credibility as to whether Black 35's neutral stance toward the death penalty motivated his strike. *Cf. Lewis v.*

United States District Court
For the Northern District of California

[25]   She wrote that she was "moderately in favor" of the death penalty, (CT 15751), would vote to maintain it, (CT 15752), and felt that the State of California should automatically put persons convicted of multiple murders to death. (CT 15753.)  On the other hand, she also wrote that the death penalty disturbed her and she was not sure she could impose it. (CT 15746, 15754.)  At voir dire, she reiterated that she simply could not say whether she would be able to impose the death penalty, (RT 641), had "misgivings" about her ability to "actually advocate the death penalty myself," (RT 642), and that the "gravity of the decision" would be a problem for her.  (RT 643.)

[26]   Several other jurors did state, at times, that they were neutral, but their responses overall showed that they favored the death penalty more than Black 35.
Red 44 (Juror No. 5) wrote she was "neutral" on the death penalty, (CT 15788, 15790), but she would vote to maintain the death penalty if it were on the ballot, felt there were crimes for which the death penalty should be automatically imposed. (CT 15789.)  She elaborated at voir dire that she believed serial murderers should be put to death.  (RT 618.)
Black 10 (Juror No. 10) stated she was neutral on the death penalty, CT 15983, and was not sure if she would vote for it.  But she also that if the crime is severe enough, "perhaps it should be imposed." (CT 15982.)  "Costly appeal, etc." was the best argument against the death penalty, *id.*  She was "moderately in favor" of it, (CT 15984), and "probably" could impose it.  (RT 1172.)  The views of Yellow 37 (Alternate Juror) were also slightly more pro death penalty than those of Black 35.  Although he too wrote he was "neutral" about the death penalty, he also said he would vote to maintain the death penalty, 16138-39, and that the death penalty could be a "good choice." (RT 1016.)
Although Petitioner argues Red 73 (Juror No. 1) believed the death penalty was "inhumane and cruel," she merely stated that was the best argument against the death penalty. She stated she had "split pro/con" feelings about the death penalty, (CT 16175), but was moderately in favor of it, and would vote to maintain it.  Green 43 (Juror No. 9) was "neutral" toward the death penalty and thought it should be used only in "extreme" cases. (CT 16212.)  However, she would vote to maintain the death penalty, (CT 16213), and the prosecutor did not even see fit to ask her further questions at voir dire.  (RT 933.)  Blue 5 (Juror No. 7) wrote he was "neutral" toward the death penalty, but that it was "acceptable," and checked both "maintain the death penalty" and "not sure" when asked if he would vote for it; overall, his responses do not evince opposition or ambivalence to the death penalty. (CT 15866-67.)

31

United States District Court

For the Northern District of California

*Lewis*, 321 F.3d 824, 831 (9th Cir. 2003) ("The proffer of various faulty reasons and only one or two otherwise adequate reasons[] may undermine the prosecutor's credibility to such an extent that a court should sustain a *Batson* challenge").  However, given that the prosecutor offered one reason that was supported in the record – albeit weakly – and not obviously pretextual, the state courts' finding that he struck Black 35 for race-neutral reasons was not an "*unreasonable determination of the fact in light of the evidence presented.*"  28 U.S.C. § 2254(d)(2) (emphasis added).

### b.      Red 17.

The prosecutor never gave reasons on the record for his strike of Red 17.   The Court of Appeal therefore offered a number of hypothetical reasons, based on its own review of the record, why the prosecutor might have challenged her: her occupation as a case worker with convicted prisoners might make her overly sympathetic to mitigating background information, she had an "education in criminal justice," had expressed negative attitudes about police witnesses and eyewitness testimony, and was "unsure" about the death penalty.  (Pet. Exh. A at 16.)[27]  The fact that even these hypothetical justifications developed are unconvincing on a review of the entire record is further evidence that the prosecutor's strikes were race-based.

First, even if Red 17's occupation as a caseworker would lead her to give great weight to background information, the comparative analysis set out above with respect to Yellow 77 showed that half of seated jurors and alternates thought the defendant's background was important.  Although Red 17 took some classes in law and criminal justice, (CT 4205), other seated jurors had even more education in that field.  Yellow 37, an alternate juror, took classes in Administration of Justice and Criminal Justice from 1987-1992, received a B.S. in Criminal

_____

[27]  As set out above, the *Batson* claim turns not on whether the appellate court can construct legitimate rationales from the record, but on the prosecutor's actual reason for the strike.  *Paulino v. Castro*, 371 F.3d 1083, 1089-1090 (9th Cir. 2004).   Ordinarily, the Court would hold an evidentiary hearing to determine whether the prosecutor could offer race-neutral reasons for his strike.  *See Paulino v. Harrison*, 542 F.3d 692, 695-96 (9th Cir. 2008) (explaining court's remand for an evidentiary hearing); *Patterson v. Alameida*, 2008 WL 2326295 (E.D. Cal. June 3, 2008) (ordering evidentiary hearing where record does not disclose prosecutor's reasons for peremptory strike).  Because the Court grants habeas relief because of the prosecutor's strikes of Yellow 77 and Red 58, it will not order an evidentiary hearing as to Red 17.

Justice, (CT 16115), and was once offered a job by a police department.  (CT 16122.)  Blue 5 (Juror No. 7) took two years of classes in Administration of Justice, where she studied both law and criminology.  (CT 15844.)

Red 17 noted that she did not believe all eyewitness testimony was accurate because "someone may wear glasses and didn't have them that date."  CT 4228.  If anything, she had a *more* positive view of eyewitness testimony than other seated jurors, many of whom expressed broader philosophical doubts about whether witnesses could ever observe accurately and objectively.  (*See* discussion of Black 35, *supra*.)

The record does not support the observation that Red 17 expressed "negative attitudes" about police witnesses.  All she did was state – using language close to that used by many prospective jurors – that it is "possible that a peace officer might not tell the truth" because "they are human."  (CT 4227.)  She also said she had had "positive" experiences with police officers, and would apply the same standards to their testimony as she would to that of other witnesses.  (CT 4220.)

Most of the reasons the Court of Appeal proposed as support for the strike do not withstand comparative scrutiny.  And although Red 17 repeatedly stated she was "neutral" on the death penalty, (*see, e.g.,* CT 4234), she came across strongly in her questionnaire as a law-and-order juror who would be favorable to the prosecution.   She wrote "I believe in the Criminal Justice System.  I think it was put in place to deter crime and protect the citizens in the community."  (CT  4220; *see also* CT 4215 ("I do believe in obedience to the laws").)  When her brother was charged with domestic violence and ordered to attend anger management classes, she believed "it was handled fairly."  (CT 4218.)  Describing a burglary of her home, she wrote "I came home from work with my young daughter to discover someone had broke into my house and stole things I worked hard to purchase."  (CT 4217.)  The prosecutor's strike of Red 17, viewed in the context of the other strikes of African-American panelists, is further circumstantial evidence that the prosecutor had a discriminatory purpose.

United States District Court

For the Northern District of California

United States District Court
For the Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## C.   Conclusion.

The state courts unreasonably applied established federal law by refusing to examine the totality of relevant facts, including a comparative juror analysis, to determine whether the prosecutor exercised peremptory strikes on the basis of race.  The record demonstrates that the prosecutor's strikes of jurors Yellow 77 and Red 58 were racially motivated, and the Court of Appeal's contrary conclusion was based on an unreasonable determination of the facts in light of the evidence presented.

## II.   Petitioner's Various Claims of Misconduct by the Trial Court and Jurors Do Not Merit Habeas Relief.

Petitioner's second claim for relief alleges that his constitutional rights under the Fifth, Sixth, Eighth and Fourteenth Amendments were violated by a series of incidents during jury deliberation, which culminated in the trial court's dismissing the last African-American juror on the panel and Petitioner's forcible removal from the courtroom after  he protested the juror's dismissal.  Although Petitioner makes a number of overlapping arguments, the Petition in essence asserts two constitutional claims.  First, Petitioner asserts that Juror No. 3 was racially biased, that racial bias infected the jury proceedings, and that all the jurors engaged in various forms of misconduct.  He asserts that the trial judge improperly investigated complaints of Juror No. 9's of bias and misconduct, improperly discharged Juror No. 9 from the jury, and improperly failed to remove Juror No. 3, which together deprived Petitioner of an impartial jury, equal protection of the laws, due process, and a unanimous jury verdict.  Second, Petitioner argues that use of excessive force to remove him from the courtroom and the trial court's subsequent admonishments improperly influenced the jury, prejudiced Petitioner, and deprived him of a fair trial.

For the reasons set forth below, the Court has no basis for finding or concluding that the California courts' rejection of these claims was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings, or was either was contrary to or involved an unreasonable application of clearly established Supreme Court law.  Petitioner is not entitled to habeas relief on these claims.

34

### A.     Claims Relating to Juror Bias and Misconduct During Deliberations.

The state court appellate record shows that during deliberations, Juror No. 9 (Red 36) sent a two-page note to the trial judge asking to be removed from the jury.  (CT 1616-17.)  She stated she had an "altercation" with Juror No. 3, who "indirectly" accused her of being "biased in favor of the defendant, because we are both African American."  (CT 1616.)  The letter also stated Juror No. 3 had repeatedly expressed anger and negative opinions about one of Petitioner's counsel, who was also African American.  (CT 1617; RT 2995.)

The trial judge informed counsel and then conducted a thorough evidentiary hearing.  He first questioned Juror No. 9.   The juror repeated that she wanted to be removed because there had been "an implication that I am biased" in favor of the defendant.  (RT 2958, 2960.)  When asked for specifics, she said that Juror No. 3 had yelled at her, slammed her hands on the table, and said

> You are causing problems, I know what's wrong with you.  I know why you are — you brought up that stuff about African-Americans in the criminal justice system.  You brought up stuff about O.J. ... you keep talking about Black this and Black that.

(RT 2960.)  Later in the questioning, Juror No. 9 explained that she herself had made several comments or raised examples during deliberations that involved race; for example, she commented that people in the Black community fear the criminal justice system, (RT 2969), and described her own initial assumption that O.J. Simpson was guilty of a crime because he fled police to draw an analogy.  (RT 2970.)

She repeated that Juror No. 3 had a "volatile viewpoint" of the defense attorney, (RT 2958), and expressed "that same anger she has with the defense attorney .... That's where her bias lies and she's connecting that to me."  (RT 2961.)  After consulting with counsel, the trial judge asked again what Juror No. 3 had done specifically that caused her to feel Juror No. 3 was not being fair or "has problems with you because of your race or anything of that nature."  (RT 2967.)  Juror No. 9 responded that it was the fact that Juror No. kept bringing up defense counsel and said counsel had "proved to her that the defendant was guilty" even before deliberations began.  (*Id.*; *see also* RT 2968 (same).)

The trial judge questioned Juror No. 9 extensively about whether she felt she could continue to serve on the jury.  (RT 2962-65, 2973.)  She explained that only Juror No. 11 admitted to hearing "some" of what Juror No. 3 had said, but the others told her they heard nothing and wanted her to retract her letter.  (RT 2959-62.)  Given that she felt the other jurors were biased, united against her, and had not been honest with her, she repeatedly stated she was not "comfortable" deliberating with the other jurors and could not continue to participate.  (RT 2962-65, 2973.)

The trial judge went on to question Jurors Nos.1, 3 and 11.  Those three jurors testified there had been no "racial overtones" or intimidation in the jurors' interactions.  (RT 2982, 2984 (Juror No. 1), 2987-88 (Juror No. 3), 2991 (Juror No. 11).)  The three jurors consistently described the ongoing conflict between Juror No. 9 and the others as frustration with the former's inability to express her own viewpoints.  (RT 2982 (Juror No. 1), 2986 (Juror No. 3), 2991 (Juror No. 11).)  Juror No. 3 denied she had said she knew Juror No. 9 would be "a problem" because she raised issues related to race; rather, she had asked Juror No. 9 to consider whether her judgment was being clouded by her "zeal to do the right thing and not put an innocent Black man in prison."  (RT 2986.)

During the judge's questioning of other jurors, Juror No. 9 sent another note indicating that she was "willing to rejoin the jury and continue deliberations."  (CT 1790.)

After hearing argument, the trial court ruled that there was good cause to remove Juror No. 9.  (RT 3000, 3003.)  He observed he believed she was "attempting to manipulate this process," RT 3000, and found it was clear from her testimony that "she would not participate in the process and she does not trust the jurors and that further deliberations involving this juror would not be in conformance with the Court's instructions."  (RT 3003.)   He did not find her assertion that she was willing to rejoin the jury credible.  (*Id.*)

The trial Judge denied defense counsel's motion for a mistrial.  (RT 3004.)  Later denying defendant's motion for reconsideration, (CT 1621-1621), the trial judge elaborated on his reasoning.  (CT vol. XII, Reporter's Augmented Transcript, November 22, 1999

United States District Court
For the Northern District of California

("11/22/99 RT") at 9-14.)   He emphasized that he relied on the jurors' demeanor and credibility to determine that "there had been no misconduct, racially motivated or otherwise, by any of the other jurors toward Juror No. 9," and that "the race of the Defendant was not a factor in their deliberations." (*Id.* at 12.)  The judge specifically found there was "no misconduct, racially motivated or otherwise," by Juror No. 3, but that Juror No. 9 was attempting to manipulate the proceedings and had evinced a "lack of willingness to participate and deliberate without prejudice or bias."  (*Id.* at 12-13.)

> **1.    Legal Standard.**

A criminal defendant has a Sixth Amendment right to a "fair trial by a panel of impartial, 'indifferent' jurors." *Irwin v. Dowd*, 366 U.S. 717, 722 (1961); *Dyer v. Calderon*, 151 F.3d 970, 973 (9th Cir.) (en banc), *cert. denied*, 525 U.S. 1033 (1998).  If only one juror is unduly biased or prejudiced or improperly influenced, the criminal defendant is denied his Sixth Amendment right to an impartial panel.  *United States v. Hendrix*, 549 F.2d 1225, 1227 (9th Cir.), *cert. denied*, 434 U.S. 818 (1977); *Dyer*, 151 F.3d at 973.  If a court is "confronted with a colorable claim of juror bias must undertake an investigation of the relevant facts and circumstances." *Dyer*, 151 F.3d at 974.

An individual may also raise a Sixth Amendment challenge to the discharge and substitution of a particular juror on the grounds that there was not good cause for it. *Hightower v. McGrath*, 2006 WL 825274, *4 (N.D. Cal. March 30, 2006);  *Perez v. Marshall,* 119 F. 3d 1422, 1426 (9th Cir. 1997), *cert denied*, 522 U.S. 1096 (1998).  In addition, because California requires unanimity of verdict from all twelve jurors in a criminal trial, *see* Cal. Const. art. I, § 16, claims regarding the right to a unanimous verdict may be cognizable on federal habeas corpus, if the conduct underlying the claim so infected the trial that the defendant was deprived of the fair trial guaranteed by the Fourteenth Amendment.

On habeas review, a trial court's findings regarding juror fitness are entitled to special deference. *Perez*, 119 F.3d at 1426 (citing *Patton v. Yount*, 467 U.S. 1025, 1036-38 & n.12

1   (1984) (whether a juror can render an impartial verdict is a question of historical fact entitled to

2   special deference); *Rushen v. Spain*, 464 U.S. 114, 120 (1983)).

3         The presence of a biased juror is a structural error not subject to harmless error analysis.

4   *Estrada v. Scribner,* 512 F.3d 1227, 1240 (9th Cir. 2008).

5               **2.      Analysis.**

6         Petitioner's claims for habeas relief on the grounds that the jury deliberations were

7
    tainted by racial prejudice and that jurors engaged in various forms of misconduct fail.
8

9         The trial court thoroughly explored Juror No. 9's allegations of impropriety by carefully

10  interviewing not only Juror No. 9, but Jurors 1, 3, and 11.  As the Ninth Circuit has observed,

11  the question of juror partiality is "essentially one of credibility, and therefore largely one of

12  demeanor."  *Tinsley v. Borg,* 895 F.2d 520, 525 (9th Cir. 1990) (internal citations and

13  quotations omitted).   Here, the trial judge explicitly noted that he observed the jurors'

14  demeanor as each described his or her version of events.  (RT 2999.)  He considered earlier

15  interactions and allegations of misconduct involving Jurors Nos. 9 and 3.  (RT 2992-93, 2996.)

16  The judge, based on his contemporaneous observations, concluded that Juror No. 9 was

17  "attempting to manipulate this process," (RT 3000), and found that her credibility "paled in

18  comparison" to that of the other jurors who testified.  (11/22/99 RT at 12.)  He found the

19  testimony of Jurors Nos. 1, 3, and 11 "totally consistent and credible," (11/22/99 RT at 11), and

20  concluded, on the basis of that testimony, that there had been "no misconduct, racially

21  motivated or otherwise, by any of the other jurors toward Juror No. 9" and that the defendant's

22  race was "not a factor" in the jury's deliberations.  (*Id.* at 12.)

23        Not only does this Court accord special deference to these findings, but the evidentiary

24  hearing provided more than adequate support for the trial court's conclusion.  The only acts or

25  statements Juror No. 9 indicated as evidence of racial bias were Juror No. 3's invectives against

26  defense counsel, (RT 2961, 2967), Juror No. 3's observations that Juror No. 9 repeatedly

27  injected race into the proceedings and her "indirect" accusation that Juror No. 9 was biased in

28  favor of the defendant, (RT 2960-61, 2968-71), and the alleged failure of other jurors to

United States District Court

For the Northern District of California

acknowledge that they heard the accusation. (RT 2961-62, 2965.) Her vague testimony about these interactions does not compel a conclusion that the jurors were racially biased or the proceedings tainted. *Cf. Henley*, 238 F.3d at 1114 (juror using racial epithets); *United States v. Heller*, 785 F.2d 1524, 1527 (11th Cir. 1986) (juror's anti-Semitic jokes during deliberations met with "gales of laughter"). Juror No. 9's subjective experience of her jury service may well have been one of intimidation, harassment, and racial bias (as Juror No. 3 told the trial judge, "if I was sitting in Juror 9's seat, I would think I was being intimidated.") (RT 2988.) But the record contains ample support for the trial judge's finding that there was no improper intimidation, racial harassment, or racial bias in the deliberations.

Petitioner argues that this Court should also consider additional evidence of misconduct and bias in the form of the declaration of Juror No. 9. (Pet. Exh. G.) The vast majority of her declaration is inadmissible under Federal Rule of Evidence 606(b). Rule 606(b) prohibits the use of juror testimony to impeach a verdict when that testimony relates to matters intrinsic to the deliberations, such as statements occurring during deliberations or the jurors' mental processes.[28] Although the rule makes an exception for testimony about "extraneous influences" affecting jury deliberations, *Tanner v. United States*, 483 U.S. 107, 117 (1983), it bars the court from considering a juror's declaration that she was subjected to pressure, coercion, or intimidation as a holdout for acquittal. *United States v. Decoud,* 456 F.3d 996, 1019 n.11 (9th Cir. 2006). Thus, the portions of Juror No. 9's declaration explaining that Juror No. 3 had prejudged the case, (Pet. Exh. G at ¶ 9), that jurors had decided to reach a verdict without her, (*id.* at ¶ 12), and that other jurors intimidated, bullied and ostracized her, (*id.* at ¶¶ 10-11, 15-16), are plainly inadmissible.

---

[28]  Rule 606(b) provides in relevant part: "Upon an inquiry into the validity of a verdict ..., a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon that or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict or ... concerning the juror's mental processes in connection therewith, except that a juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror. Nor may ... evidence of any statement by the juror concerning a matter about which the juror would be precluded from testifying be received for these purposes."

United States District Court

For the Northern District of California

1    Nor are the portions of the declaration which touch upon racial bias admissible.  There

2  may be instances in which it may be appropriate to pierce the secrecy and sanctity of the jury

3  deliberation process in order to investigate allegations of racial bias.  *See, e.g., United States v.*

4  *Heller*, 785 F.2d 1524 (11th Cir. 1986) (considering testimony about ethnic slurs and jokes

5  about the defendant during deliberations and concluding that ethnic bias warranted a mistrial);

6  *United States v. Henley*, 238 F.3d 1111, 1119-1120 (9th Cir. 2001) (suggesting, in dictum, that

7  evidence of racial bias should not be subject to Rule 606(b)'s prohibitions against juror

8  testimony).  But Juror No. 9's declaration echoes her testimony during the trial court's

9  investigation, and raises no more of an inference of racial bias than her testimony did there.  She

10  states that Juror No. 3 "accused [her] of being biased in favor of the defendant because we were

11  both Black," (Pet. Exh. G at ¶¶ 7, 11), that Juror No. 3 was "hostile" toward her and made

12  negative comments about her, (*id.* at ¶ 8), and that Juror No. 3 accused her of "bringing up all

13  this stuff about African-Americans and the justice system" to prevent the jurors from reaching a

14  verdict.  (*Id.* at ¶ 12.)  Without explicitly stating that she felt the jurors were racially biased, she

15  described Juror No. 3's acts as "racial harassment" and stated she "realized that the other jurors

16  just considered me to be a Black hold-out juror who was standing in the way of their

17  deliberations." (*Id.* at ¶ 13.)  But these characterizations are not themselves proof of racial bias.

18  Just as in *United States v. Decoud,* 456 F.3d 996, 1018-1019 (9th Cir. 2006), although Juror No.

19  9's declaration alludes to racial matters, it does not contain evidence of racial bias toward the

20  defendant, so the Court will not pierce the juror's deliberations merely because she "felt some

21  racial pressure."  *See id.* at 1019.

22    Even if the Court were to consider the declaration's additional explanation of race-

23  related issues, it would still find substantial support in the record for the trial court's

24  conclusions that the jury as a whole was not biased, that Juror No. 3 was not biased, and that

25  there was just cause to dismiss Juror No. 9.  Two other jurors corroborated Juror No. 3's

26  description of her words and acts.  Juror No. 3's explanation of the allegedly biased comment –

27  that she asked  Juror No. 9 whether her judgment might be influenced by her desire to avoid

28  accidentally convicting an innocent black man as a "way to try and get some dialogue back,"

1    was reasonable and consistent with other jurors' reports of frustration.  (RT 2986-27.)  Juror

2    No. 9, on the other hand, stated over and over that she was not comfortable remaining on the

3    jury and could not participate in deliberations.  (RT 2962-65.)

**B.   Claim That Force Used to Restrain and Remove Petitioner Prejudiced Him.**

After the trial judge denied Petitioner's motion for a mistrial the second time and

confirmed that he would dismiss Juror No. 9, the jurors were called back into court.  (RT 3004.)

The judge dismissed Juror No. 9 and seated an alternate juror.  (*Id.*)  At that point, Juror No. 9

was the sole African-American juror on the panel.[29]  As the trial judge admonished the jurors to

begin deliberations anew, Petitioner interjected:

| | |
|---|---|
| The Defendant: | Uh-huh, I object. |
| The Court: | This means – |
| The Defendant: | You can't do that. |
| The Court: | This means the original – |
| The Defendant: | Race issues being brought up.  He started this by kicking off all the Black jurors.  He started this.  He kicked off all the Black jurors and started this.  He started this racism.  There's no way that you can go on with a fair jury here, your Honor.  This is not fair.  This is prejudiced the way you guys are doing it.  This is racism.  This is nothing but racism, man.  What's going on, man?  You keep off all the Black jurors. |
| [The Prosecutor]: | Your Honor, push the button. |
| The Defendant: | He did that intentionally. |
| | I'm not going – I'm going to talk.  I'm going to talk. This is racism going on.  Ain't no way they had jurors can be fair. There's no way these jurors can be fair. |
| The Court: | Push the button. |

United States District Court
For the Northern District of California

---

[29]  The sole black male on the jury, Juror No. 12 (Red 55) had been excused near the end of the trial when he discovered he knew one of the potential witnesses.  (CT 1572.)

41

| | | |
|---|---|---|
| 1 | The Bailiff: | Stop resisting. |
| 2 | [The Prosecutor]: | Keep it up, Mr. Love. |
| 3 | The Court: | Clear the courtroom. |
| 4 | The Defendant: | You see what happens?  I just want to talk and they call all these police. |

The Bailiff:          Stop resisting.

[The Prosecutor]:     Keep it up, Mr. Love.

The Court:            Clear the courtroom.

The Defendant:        You see what happens?  I just want to talk and they call all these police.

And whoever was hitting me, it didn't even hurt.

(RT 3005-3006.)

The declaration of Petitioner's trial counsel indicates that during Petitioner's outburst, a total of eight courtroom deputies and other officers tried to remove Petitioner from the courtroom, pushing him to the floor, jumping on him, and hitting him.  (Pet. Exh. F at ¶¶ 7-8.) Petitioner did not resist or attempt to get out of the chair, flail his arms, push, hit, kick; he simply tried to brace himself in his chair.  (*Id.*)  Jurors were visibly upset, and two began to cry. (*Id.* at ¶ 9; *see also* 11/22/99 RT at 4-5.)

After Petitioner was handcuffed by his feet and wrists in front of the jurors and led out of the courtroom, (*id.* at ¶ 7), the trial judge immediately admonished the jury that they should not consider the incident in their deliberations in any manner.  (RT 3006.)

Over the weekend, Juror No. 4 (Blue 7) wrote the Court that "[a]fter that frightening experience in the courtroom on Thursday," she was fearful for her own safety and that of Juror No. 3, because she felt the jurors had been unfairly portrayed as racist.  (CT 1799-1800.)  When the jury was reconvened, the trial court individually questioned the jurors to determine whether they could remain fair and impartial; each assured the judge that they could.  (11/22/99 RT at 14-31.)  Jurors Nos. 3 and 4 expressed fears for their physical safety.  (*Id.* at 21, 33-37.)  The trial judge explained that their private information was confidential.  (*Id.*)  The two jurors stated that their fear would not affect their deliberations.  (*Id.* at 21, 37.)  The trial court denied the motion for mistrial.  (*Id.* at 39.)

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

###### 1.    Legal Standard.

The Sixth Amendment guarantees the criminally accused "a fair trial by a panel of impartial, indifferent jurors.'" *United States v. Sarkisian*, 197 F.3d 966, 981 (9th Cir. 1999) (quoting *Irvin v. Dowd*, 366 U.S. 717, 722 (1961)).[30]  Restraining a criminal defendant can cause jury prejudice and impair the presumption of innocence.  *Duckett v. Godinez,* 67 F.3d 734 (9th Cir. 1995).  But the constitutional right to an impartial jury is not absolute.  Restraining an unruly defendant and removing him from the courtroom are within the "constitutionally permissible ways for a trial judge" to handle a defiant defendant and to insure the dignity, order, and decorum of court proceedings.  *Illinois v. Allen*, 397 U.S. 337, 343-44 (1970); *see also Deck v. Missouri,* 544 U.S. 622, 628 (2005) (the right to be free of restraint during trial "has a constitutional dimension," but that right may be overcome "by essential state interests such as physical security, escape prevention, or courtroom decorum.").  The Sixth Amendment "affords no relief when the defendant's own misconduct caused the alleged juror partiality and the trial judge employed reasonable means under the circumstances to preserve the trial's fairness." *Williams v. Woodford,*  384 F.3d at 626 (citing *United States v. Chaussee*, 536 F.2d 637, 639-641 (7th Cir. 1976) (no relief when the defendant attempted to escape from the courtroom in the jury's presence and the trial judge fully informed himself of what had occurred, assessed its impact on the jury, and promptly admonished the jury to disregard the defendant's misconduct), *abrogated on other grounds by Lewis v. United States*, 523 U.S. 155, 162 (1998)). Ultimately, the court should "look at the scene presented to jurors and determine whether what they saw was so inherently prejudicial as to pose an unacceptable threat to defendant's right to a fair trial ...."  *Holbrook v. Flynn*, 475 U.S. 560, 572 (1986) (shackling); *United States v. Sarkisian,* 197 F.3d 966, 981 (9th Cir. 1999) (citing *United States v. Smith*, 962 F.2d 923, 935 (9th Cir.1992) (court should consider whether misconduct and reaction to it "so affected the jury's ability to consider the totality of the evidence fairly that it tainted the verdict")).

---

[30] A defendant's misconduct during regular court proceedings and the court's efforts responsive efforts to contain it, however, are not extraneous evidence.  *Williams v. Woodford,*  384 F.3d 567, 626 (9th Cir. 2004).

1

2.      **Analysis.**

2      The trial court's finding that Petitioner was not prejudiced was neither an unreasonable

3  application of the law nor an unreasonable determination of the facts in light of the evidence.

4      First, Petitioner has not shown that the means used to subdue him were unlawful; even

5  taking the facts as described  by his defense counsel as true, the court's measures were not so

6  extreme as to be unreasonable.

7      Second, the trial judge's implicit finding that the jurors' ability to deliberate impartially

8  was not impaired by Petitioner's outburst and its consequences was not unreasonable.   He

9  conducted a thorough examination of every juror, asking the jurors whether they could put aside

10 what they had seen in open court and deliberate fairly and according to the law.  (*See, e.g.,*

11 11/22/99 RT at 14.)  The judge took pains to confirm that even those jurors who had expressed

12 fears for their safety could continue to deliberate fairly.  (*See, e.g, id.* at 20-21 (confirming that

13 Juror No. 4 could "absolutely" follow the law and deliberate fairly and impartially).)  He had an

14 opportunity to observe their demeanor.  The judge's assessment of juror partiality is entitled to

15 special deference, *Perez*, 119 F.3d at 1426 (citing *Patton v. Yount*, 467 U.S. at 1036-38 & n.12;

16 *Rushen,* 464 U.S. at 120).  Petitioner has not produced clear and convincing evidence that this

17 factual determination was unreasonable.

18

19                              **CONCLUSION**

20      In light of the foregoing, the petition for a writ of habeas corpus is hereby GRANTED.

21 Respondent shall release Petitioner from custody, unless, with thirty days of the filing of this

22 order and entry of judgment thereon, respondent has filed an appeal with the United States

23 Court of Appeals for the Ninth Circuit or the State has set a date for a new trial.

24      **IT IS SO ORDERED.**

25 Dated:  November 4, 2008                              _Jeffrey S White_____

26                                                      _____

27                                                      JEFFREY S. WHITE
                                                        UNITED STATES DISTRICT JUDGE
28

*United States District Court*
For the Northern District of California